UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EWING M. BROWN, an individual, and JEANNE BROWN, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>GENERAL STEEL DOMESTIC SALES, LLC, a Colorado limited liability company doing business as "GENERAL STEEL CORPORATION;" JEFFREY WAYNE KNIGHT, an individual; RADIO LICENSE HOLDING VI, LLC, a Delaware limited liability company; ABC RADIO NETWORKS, LLC, a Delaware limited liability company; PAUL HARVEY AURANDT, an individual; and DOES 1 through 10, inclusive<br><br>Defendants. | CASE NO. CV 08-00779 MMM (SHx)<br><br>ORDER GRANTING MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS |

Ewing and Jeanne Brown filed this action on February 5, 2008 against General Steel and the remaining defendants; the action concerns a contract into which the Browns entered to purchase a pre-made steel building from General Steel. The complaint alleges claims for seller's nondelivery of goods, and money had and received against General Steel; false advertising, unfair competition, and intentional and negligent misrepresentation against all defendants; and violation of the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) against Knight. The Browns previously filed an action in state court that concerned the same transaction and alleged identical causes of action (with the exception of the RICO claim). The state court granted General Steel's motion to compel arbitration pursuant to an arbitration clause in the contract.

On March 19, 2008, General Steel filed a motion to compel arbitration in this action and Knight filed a separate motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. On April 23, 2008 the remaining defendants filed a motion to compel arbitration. This order addresses all three motions.

## I. FACTUAL BACKGROUND

### A. The Underlying Facts of the Transaction

Many of the following facts are alleged in the complaint and accepted as true for purposes of the pending motions. Where the state and federal complaints differ, the court makes note of the difference. It also addresses the terms of the contract that are in dispute.

#### 1. The Parties

Plaintiffs Ewing and Jeanne Brown are married and reside in California.[1] Jeanne Brown is 79 years old and recently sustained a hip fracture from which she is recuperating.[2] Ewing Brown is 86 years old and is currently on a course of chemical medication as part of his treatment for colon cancer; this condition required surgery in October 2007.[3] Because of the Browns' medical conditions, they cannot attend arbitration proceedings in Colorado.[4]

General Steel is a Colorado limited liability company with its principal place of business in

---

[1]Complaint, ¶¶ 2-3.

[2]Declaration of Jeanne Brown ("Brown Decl."), ¶ 5.

[3]*Id.*, ¶ 6.

[4]*Id.*, ¶ 7.

Lakewood, Colorado.[5] General Steel manufactures pre-made multipurpose steel buildings ("the buildings"), which are shipped to California, Iowa, Tennessee, and Arizona for installation.[6] Jeffrey Wayne Knight, who is a resident of Colorado, is a director and principal of General Steel.[7] Radio License Holding VI, LLC ("Holding") is a Delaware limited liability company with its principal place of business in New York City. The Browns allege that Holding is the owner of Los Angeles radio station KABC, 790 AM (KABC or "the station").[8] ABC Radio Networks, LLC ("Network") is a Delaware limited liability company with its principal place of business in New York City. The Browns allege that Network supplies the bulk of KABC's programming.[9] Paul Harvey Aurendt is an Illinois resident and the host of the Paul Harvey radio program ("the program") on KABC.[10]

**2. The Advertising**

General Steel has allegedly advertised the buildings to the public since August 25, 2004. Daily radio commercials regarding the buildings are broadcast on the Paul Harvey show on KABC.[11] Although General Steel's website purportedly implies that it manufactures the products, the Browns allege that it has no manufacturing facilities, plants, or warehouses of its own. They assert that General Steel's statement that its buildings are engineer-certified to meet all U.S. building codes is misleading because the company has no personnel in California who are capable of or willing to perform site

---

[5]Complaint, ¶ 4.

[6]*Id.*, ¶ 12. The website states that the buildings are used for warehouses, manufacturing plants, church buildings, gyms, aircraft hangers, storage units, riding arenas, barns, farm outbuildings, retail outlets, and office applications. (*Id.*)

[7]*Id.*, ¶ 5. The Browns' state court complaint named only General Steel. (See generally Declaration of Michael M. Amir in Support of Motions to Compel Arbitration and to Dismiss ("Amir Decl."), Exh. 1 (State Complaint).) The Browns have purport to have discovered specific information regarding other defendants and have named them in this action.

[8]*Id.*, ¶ 6.

[9]*Id.*, ¶ 7.

[10]*Id.*, ¶¶ 7-8.

[11]*Id.*, ¶ 13. In the state court complaint, the Browns did not identify the Paul Harvey show specifically; they merely referenced KABC.

inspections to ensure that its products meet that state's regulations.[12]

**3. The Transaction**

Based on the statements in General Steel's advertisements, the Browns on April 12, 2005 executed and delivered a purchase order pursuant to which they agreed to buy an all-steel building for $28,195.00. The Browns were advised that the building would be delivered within six months of the date of the purchase order.[13] On May 23, 2005, the Browns received what was to have been a final billing from General Steel, reflecting a net price of $55,882.36 and a balance due of $44,804.95; the Browns paid this balance in full.[14]

Between May 26 and October 12, 2005, General Steel sent the Browns four different sets of plans for the building. The Browns sent each to a local contractor, who reviewed them for compliance with California building codes. After the contractor identified required changes, General Steel made the changes and sent a new copy of the plans. On October 12, 2005, the contractor determined that General Steel's fourth set of plans was incorrect and unusable.[15] On October 13, 2005, the Browns faxed General Steel a letter demanding that their payments be refunded. General Steel refused to cancel the purchase order or refund any of the money that had been paid on October 25, 2005.[16]

**4. The Arbitration Clause**

Paragraph 17 of the purchase order plaintiffs signed contains a provision requiring that disputes under the contract be submitted to arbitration. The agreement reads:

> "Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration

---

[12]*Id.*, ¶ 34.

[13]*Id.*, ¶ 14.

[14]*Id.*, ¶ 16. The court notes the discrepancy between the original purchase price of $28,195.00, and the price paid by the Browns of $55,882.36. Although they do not explain the differing prices, the parties do not dispute the figures.

[15]*Id.*, ¶¶ 16-19.

[16]*Id.*, ¶ 20.

Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The party initiating arbitration shall advance all costs thereof. The place of arbitration shall be Denver, Colorado. This agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado. The parties acknowledge that this agreement evidences a transaction involving interstate commerce. The United States Arbitration Act shall govern the interpretation, enforcement, and proceedings pursuant to the arbitration clause in this agreement."[17]

**5. Prior Litigation**

**a. The California State Court Action**

On February 24, 2006, the Browns (represented by the counsel that is attorney of record in this action) filed a state court complaint against General Steel. The first six causes of action in the state court complaint are identical to claims asserted in this action; the only claim that has been added in the federal action is a cause of action for violation of RICO.[18] On March 31, 2006, General Steel filed a motion to compel arbitration, arguing that the parties' agreement contained a broad arbitration clause.[19] On June 1, 2006, without hearing oral argument, the state court granted the motion.[20] There is some disagreement as to what occurred next. The Browns contend it was General Steel's responsibility to advance arbitration costs and otherwise pursue arbitration because it was the "party [that] initiat[ed]

---

[17]*Id.*, Exh. A. (Purchase Order), ¶ 7.

[18]*Id.* A review of the two complaints reveals that the allegations are virtually identical. The only differences are (1) the addition of certain defendants (i.e., Network, Holding, Knight, and Aurendt); (2) the Browns' allegation that General Steel does not manufacture the products it sells (compare Complaint, ¶ 34 with State Complaint, ¶ 29); and (3) new allegations regarding false advertising, including the attachment of an order from the District of Colorado indicating that other consumers have been awarded damages for false advertising (see Complaint, ¶ 36.)

[19]Amir Decl., ¶ 4. The Browns agree that a motion to compel arbitration was filed, but assert that the filing date was April 17, 2006. (Declaration of Brian J. Jacobs ("Jacobs Decl."), ¶ 2.)

[20]Amir Decl., Exh. 2; Jacobs Decl., ¶ 2.

arbitration" by filing a motion to compel.[21] General Steel maintains that the Browns were required to arbitrate under the terms of the court's order and that they failed to pursue arbitration.[22] Both parties agree, however, that the dispute was not arbitrated.[23]

On January 10, 2007, the state court held a status conference; due to a calendaring error, the Browns' counsel did not attend.[24] Following the conference, the court issued an "Order to Show Cause re: Dismissal" based on General Steel's representation that no arbitration had been initiated.[25] The court scheduled the order to show cause for hearing on February 14, 2007. Both parties appeared on that date, and the hearing was continued to March 29, 2007. Neither party appeared on March 29,[26] and the state court dismissed the action.[27]

On October 3, 2007, the state court heard the Browns' motion to set aside the dismissal. The court continued the motion to November 30, 2007; its minute order stated that "[p]laintiff [would] initiate arbitration and set [a] date for arbitration prior to 11/30/07."[28] The court noted that the "[p]arties [had] agree[d] that on 11/30/07, [the] court [would] modify the dismissal order to allow the Court to

---

[21]Jacobs Decl., ¶ 4.

[22]Amir Decl., ¶ 5.

[23]Jacobs, the Browns' attorney, describes his communications with Mr. Amir, General Steel's counsel, in his declaration. On September 28, 2006, the Browns sent General Steel a letter stating that it had to serve them with a "demand" as required by the Commercial Arbitration Rules of the American Arbitration Association and pay the filing fee. (Jacobs Decl., ¶ 5; *id.*, Exh. A.) General Steel refused to comply with the Browns' demand on October 6, 2006, asserting that it was the Browns' obligation to initiate arbitration because it was they who had a claim against General Steel. (*Id.*, ¶ 6; *id.*, Exh. B.) Prior to the state court's ruling on the motion to compel, Jacobs discussed the possibility of arbitrating the dispute in California; after the court's ruling, however, General Steel was unwilling to entertain such a proposal. (*Id.*, ¶ 3.)

[24]*Id.*, ¶ 7.

[25]Amir Decl., Exh. 3.

[26]Jacobs Decl., ¶ 8.

[27]Amir Decl., Exh. 5.

[28]*Id.*, Exh. 6.

retain jurisdiction to enforce the arbitration agreement and arbitrator's award."[29] On November 30, 2007, the Browns voluntarily dismissed the state court action; the state court subsequently found their motion to set aside the dismissal moot.[30]

**b. The Colorado Action**

On March 31, 2006, at the same time that it filed its motion to compel arbitration in the California action, General Steel filed an action in Colorado state court to compel the Browns to arbitrate the dispute.[31] On April 18, 2006, the Browns removed the action to federal court, asserting that it fell within the court's diversity jurisdiction.[32] The district court for the District of Colorado set a status conference for October 27, 2006; the Browns' counsel did not appear at the conference.[33] On November 1, 2006, General Steel dismissed the Colorado action because the California state court had granted its motion to compel arbitration.[34]

## II. DISCUSSION

### A. General Steel's Motion to Compel Arbitration

Collateral estoppel, or issue preclusion, "prevents relitigation of all 'issues of fact or law that were actually litigated and necessarily decided' in a prior proceeding." *Robi v. Five Platters*, 838 F.2d 318, 322 (9th Cir. 1988) (quoting *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)); see also *Branson v. Sun-Diamond Growers*, 24 Cal.App.4th 327, 339-40 (1994) (noting that in California, the doctrine of collateral estoppel governs issue preclusion). "Federal courts are

---

[29]*Id.*

[30]*Id.*, Exhs. 7-8. Jacobs states that the reason that he ultimately dismissed the state court action without prejudice was that "his elderly clients, who are seventy-nine and eighty-six years of age, did not wish to attend an arbitration in Colorado." (Jacobs Decl., ¶ 10.)

[31]Declaration of Robert J. Shilladay III in Support of Motion to Compel Arbitration ("Shilliday Decl."), ¶ 2.

[32]*Id.*

[33]*Id.*, ¶ 4. Shilliday reports that the court attempted to contact Jacobs by telephone but was told he was not available. (*Id.*.)

[34]*Id.*, ¶ 5.

compelled by the 'full faith and credit' statute to give collateral estoppel and res judicata effects to the judgments of state courts." *Southeast Resource Recovery Facility Auth. V. Montenay Intern. Corp.*, 973 F.2d 711, 712 (9th Cir. 1992).

Certain threshold requirements must be met before collateral estoppel applies: (1) the issue whose relitigation a party seeks to preclude must be identical to that decided in the former proceeding; (2) the issue must have been actually litigated and necessarily decided in the earlier proceeding; and (3) the decision in the former proceeding must be final and on the merits. *Branson*, 24 Cal.App.4th at 346; see also *In re Executive Life Ins. Co.*, 32 Cal.App.4th 344, 373 (1995) ("Issue preclusion requires both an identity of issue in the later and earlier cases and that the issue be entirely necessary to the decision in the earlier case").

The Ninth Circuit has squarely addressed the issue presented in this case under California law. In *Southeast Resource*, a California state court rejected one party's request that an arbitration be enjoined. The effect of the denial was to order the underlying dispute to arbitration. See *Southeast Resource*, 973 F.2d at 712. After the state court ruled, the losing party filed a parallel motion to stay arbitration in federal court. See *id.* The district court disagreed with the state court and stayed the arbitration. See *id.*

The Ninth Circuit reversed. As a threshold matter, it held that the state court order was, in effect, an order compelling arbitration. See *id.* at 713 ("Thus, the denial of an injunction against the arbitration process is an order to compel arbitration"). The court then concluded that the decision should be accorded preclusive effect. It reasoned:

> "Under California law, an order compelling arbitration is the final order in a special proceeding. Once the order is made, the special proceeding is complete and the arbitration must proceed. The order cannot be appealed or reviewed until after the arbitration is completed, and the trial court will not revisit the issue. See *Atlas Plastering, Inc. v. Superior Court, Alameda County*, 72 Cal.App.3d 63, 67 . . . (1977); *Maddy v. Castle*, 58 Cal.App.3d 716, 719 . . . (1976); *Jardine, Matheson & Co. v. Pacific Orient Co.*, 100 Cal.App. 572, 280 P. 697, 698 (1929). Thus, an order compelling arbitration is 'sufficiently firm to be accorded conclusive effect' and is entitled to full

faith and credit. *Sandoval v. Superior Court*, 140 Cal.App.3d 932, 936 . . . (1983); see *Lounge-A-Round v. GCM Mills, Inc.*, 109 Cal.App.3d 190, 198 . . . (1980) (holding that the dismissal of a petition to compel arbitration is sufficiently final for purposes of res judicata because the dismissal was 'final as to a particular issue')." *Id.* at 713.

Consequently, the Ninth Circuit held, "a California court order compelling arbitration is given preclusive effect in federal court." *Id.* The Browns argue for a different interpretation of California law. They suggest that, because orders compelling arbitration are not appealable, they are also not "final" for issue preclusion purposes.[35] While the California courts have not conclusively decided this question, and the fact that orders compelling arbitration are not appealable raises a question regarding their finality, the court is bound the Ninth Circuit's interpretation of state law. See *Pacific Telesis Group v. National Union Fire Ins. Co. of Pittsburgh, PA*, No. C 98-2555 CRB, 1999 WL 155697, *2 (N.D. Cal. Mar. 16, 1999) ("Defendant does not contend that California law has changed since *Lunsford* was decided. It merely argues that the *Lunsford* court misapplied California law. The Court is not aware of any authority, however, that permits a district court to disregard the ruling of its circuit on the ground that the district court believes the decision is incorrect"); see also *Electronics for Imaging, Inc. v. Atlantic Mut. Ins. Co.*, No. C 06-03947 CRB, 2006 WL 3716481, *6 (N.D. Cal. Dec. 15, 2006) (holding that the district court is bound to apply the Ninth Circuit's interpretation of California law); *Jurinko v. Medical Protective Co.*, No. 03-CV-4053, 2006 WL 1791341, *4 n. 15 (E.D. Pa. June 23, 2006) ("A federal district court is bound by circuit court interpretations of state law absent a strong indication that the state's highest court would decide differently"); *St. Paul Travelers v. Payne*, 444 F.Supp.2d 519, 524 (D.S.C. 2006) ("As such, even though South Carolina courts have not squarely addressed this issue, the court is bound by the Fourth Circuit's interpretation of the content of unsettled state law").[36]

---

[35]See Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Compel Arbitration ("Pl.'s Mem.") at 2.

[36]As a court in the Northern District of California has explained, "[a]lthough a circuit court's prediction of state law is not binding in the same way as is its definitive interpretation of federal law, as a practical matter a circuit court's interpretations of state law must be accorded great deference by district courts within the circuit." *Johnson v. Symantec Corp.*, 58 F.Supp.2d 1107, 1111 (N.D. Cal. 1999). The *Johnson* court observed, in this regard, that, were a party to appeal the district court's ruling,

For these reasons, the court concludes that it is bound by *Southeast Resource* to give the state court's order compelling arbitration preclusive effect,[37] and to order the parties' dispute to

---

the Ninth Circuit would review its interpretation of California law *de novo*, and a Ninth Circuit panel (as opposed to the *en banc* court) would be bound to follow the circuit's prior decision. See *id.* (citing *Salve Regina College v. Russell*, 499 U.S. 225 for the proposition that appeals courts should not defer to district court interpretations of state law). By this logic, barring a change in California law (which the Browns do not suggest is imminent), the Ninth Circuit's decision in *Southeast Resource* is binding authority even if it is not *as* binding as an interpretation of federal law would be. See *id.*

[37]Another jurisdictional doctrine supports such a result. Under the *Rooker-Feldman* doctrine, which takes its name from the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983), a district court does not have subject matter jurisdiction to hear a direct appeal from a final judgment of a state court. See *Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir. 2003). The losing party in state court is thus barred from seeking what in substance would be appellate review of a state judgment in federal court, even if that party contends the state judgment violated his or her federal rights. *Johnson v. DeGrandy*, 512 U.S. 997, 1005-06 (1994); *Allah v. Superior Court*, 871 F.2d 887, 891 (9th Cir. 1989) (stating that the *Rooker-Feldman* doctrine "applies even though the direct challenge is anchored to alleged deprivations of federally protected due process and equal protection rights"), superseded by statute on other grounds as stated in *Schroeder v. McDonald*, 55 F.3d 454, 458 (9th Cir. 1995); *Worldwide Church of God v. McNair*, 805 F.2d 888, 891 (9th Cir. 1986) ("This doctrine applies even when the challenge to the state court decision involves federal constitutional issues").

The Ninth Circuit has applied the *Rooker-Feldman* doctrine narrowly to cases where "a federal plaintiff both asserts as her legal injury legal errors or errors by the state court *and* seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004). Although the circuit has not addressed whether the *Rooker-Feldman* doctrine applies to state court decisions on motions to compel arbitration, *Kougasian* suggests that it is applicable only where the losing party in state court explicitly seeks relief from the state order in federal court. Here, the Browns *de facto* seek relief from an adverse state court ruling, and recent unpublished decisions from the Ninth Circuit suggest that the *Rooker-Feldman* doctrine bars such an action. See, e.g., *Hanson v. Firmat*, No. 06-56118, 2008 WL 836686, *1 (9th Cir. Mar. 27, 2008) (Unpub. Disp.) ("The district court properly concluded that the *Rooker-Feldman* doctrine bars Hanson's action because it is a 'forbidden de facto appeal' from judicial decisions of a state court, and raises constitutional claims that are 'inextricably intertwined' with those prior state court judgments"); *Kobayashi v. Racho*, No. 07-55242, 2008 WL 833144, *1 (9th Cir. Mar. 26, 2008) (Unpub. Disp.) ("The district court properly determined that the *Rooker-Feldman* doctrine bars Kobayashi's claim that a judgment dismissing a prior state court case is invalid and void because it is a 'forbidden de facto appeal' from a judicial decision of a state court").

Federal courts in other circuits have applied the *Rooker-Feldman* doctrine to state court orders granting or denying motions to compel arbitration. In *American Reliable Ins. Co. v. Stillwell*, 336 F.3d 311 (4th Cir. 2003), the Fourth Circuit applied the doctrine where appellants sought a federal court order compelling arbitration after they had been denied such an order in state court. See *id.* at 317. The court noted that appellants "were asking the federal courts to reach the 'correct' result that they believe was denied in state court." *Id.* Consequently, the court concluded, "[a]ppellants' federal action is the functional equivalent of an appeal of the state court order denying arbitration and is impermissible under

arbitration.[38] The state court directed "[p]laintiff[s] [to] initiate arbitration and set [a] date for arbitration prior to 11/30/07."[39] The Browns suggest, although they do not directly argue, that General Steel must initiate the arbitration and pay the relevant fees. Because the state court's order, which is preclusive, indicates otherwise, the court directs the Browns to initiate arbitration if they seek relief on their contract claims.

**B. The Non-Signatory Defendants' Motion to Compel Arbitration**

On April 23, 2008, defendants Holding, Network, and Aurendt ("the non-signatory defendants") filed a motion to compel arbitration. They repeat much of the argument advanced by General Steel in its motion. The critical difference between the motions, however, is that the non-signatory defendants were not parties to the original purchase contract and thus to the arbitration agreement. Their motion thus raises two questions: whether, as non-signatories, they can compel arbitration of their dispute with

---

the *Rooker-Feldman* doctrine." *Id*. Other decisions have reached a similar result. See *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 202 (4th Cir. 2000) ("Brown & Root took its best shot on its motion to compel arbitration in the state courts. It lost in that effort and now seeks to avoid the *Rooker-Feldman* bar by attempting to recast in various ways what occurred in the state trial court. But no matter how many ways Brown & Root tries to renovate its claim, the result is the same: Brown & Root cannot obtain what amounts to appellate review of a state court decision in federal district court"); *Mailly v. Wachovia Corp.*, No. 1:03CV309, 2004 WL 601654, *3 (M.D.N.C. Mar. 9, 2004) ("As reflected by its order compelling arbitration, the state court already found a valid arbitration clause governing the disputes regarding Ms. Mailly's account. Therefore, Ms. Mailly is, in essence, seeking review of the state court's order to compel arbitration, and the *Rooker-Feldman* doctrine applies"); *Tyco Healthcare Retail Group, Inc. v. Kimberly-Clark Corp.*, No. 03-C-0156-C, 2003 WL 23204653, *4 (W.D. Wis. July 24, 2006) ("Thus, because the state court determined that the parties must arbitrate their dispute concerning royalty payments, succession and combination and because plaintiffs alleged these issues in their amended complaint, the *Rooker-Feldman* doctrine bars this court from revisiting the state court's decision to compel arbitration as to these issues").

[38]Because the state court examined the contract and found that the arbitration clause was enforceable, and because that decision must be given preclusive effect, the court declines to address the Browns' argument that the arbitration agreement is unconscionable.

The Browns' assertion of a RICO claim, does not bear, in any manner, on the arbitrability of the parties' dispute. The Supreme Court has held that there is "no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate RICO claims." *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 242 (1987); see *id*. ("Accordingly, the McMahons, 'having made the bargain to arbitrate,' will be held to their bargain. Their RICO claim is arbitrable under the terms of the Arbitration Act").

[39]Amir Decl., Exh. 6.

the Browns; and if they cannot, whether the court should stay the action pending completion of the arbitration.

**1. Whether the Non-Signatory Defendants can Compel Arbitration**

"Generally, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *International Paper Co. v. Schwabedissen Maschinen & Analgen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960)). The Ninth Circuit has recognized an exception to this rule, however, for non-signatory parties that can be bound to the arbitration agreement under ordinary contract or agency principles. See *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) ("[W]e explained that 'nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles,'" quoting *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986)). There are five theories a signatory can invoke to compel arbitration against a non-signatory: "'1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'" *Id.* (quoting *Thompson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). Where, as in this case, however, a non-signatory seeks to compel a signatory to arbitrate, a different analysis applies. See *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (drawing a distinction between cases in which signatories seek to compel arbitration against non-signatories and cases in which non-signatories seek signatories to arbitrate, and noting that "a willing non-signatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an 'alternative estoppel theory,'" which is more lenient than the five theories laid out in *Thompson*); *Thompson-CSF*, 64 F.3d at 779 (drawing the same distinction and noting that "the circuits have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed"); see also *Comer*, 436 F.3d at 1101 ("*signatories* [can be] required to arbitrate claims brought by nonsignatories 'at the nonsignatory's insistence because of the close relationship between the entities involved,'" quoting *E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediaries*, 269 F.3d 187, 199 (3d Cir. 2001) (emphasis original)); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 800 (8th Cir. 2005) ("The courts clearly recognize a

nonsignatory's ability to force a signatory into arbitration under the 'alternative' estoppel theory when the relationship of the persons, wrongs and issues involved is a close one"). Generally, "arbitration is more likely to be [compelled] when the party resisting arbitration is a signatory." *Amisil Holdings Ltd. v. Clarium Capital Management*, No. C06-05255 MJJ, 2007 WL 2768995, *5 (N.D. Cal. Sept. 20, 2007).

Courts have identified two circumstances under which a non-signatory can invoke equitable estoppel to compel a signatory to arbitrate:

> "(1) the complaint raises allegations of substantially interdependent and concerted misconduct by both a signatory and one or more non-signatories; and (2) this misconduct is founded in and intertwined with the underlying contractual obligations." *Reddam v. KPMG LLP*, No. SACV04-1227GLT(MANx), 2004 WL 3761875, *5 (C.D. Cal. Dec. 14, 2004) (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)).[40]

It is appropriate to compel arbitration where claims allege "substantially interdependent and concerted misconduct" by a signatory and non-signatory the "lawsuit against [the] non-signator[y] is inherently bound up with [the] claims against [the] signatory," and compelling arbitration is necessary "to avoid

---

[40]See also *Amisil*, 2007 WL 2768995 at *14 (same); *Chastain v. Union Sec. Life Ins. Co.*, 502 F.Supp.2d 1072, 1077 (C.D. Cal. 2007) ("First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must 'rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory. When each of a signatory's claims against a nonsignatory 'makes reference to' or 'presumes the existence of' the written agreement, the signatory's claims 'arise[ ] out of and relate . . . directly to the [written] agreement,' and arbitration is appropriate. Second, 'application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.' Otherwise, 'the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted,'" quoting *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395 (4th Cir. 2005)); *Jones v. Deutsche Bank AG*, No. C 04-05357 JW, 2007 WL 1456041, *2 (N.D. Cal. May 17, 2007) ("First, equitable estoppel applies where the 'signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory.' Second, equitable estoppel is appropriate where 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed'" (citations omitted)); *Hawkins v. KPMG LLP*, 423 F.Supp.2d 1038, 1050 (N.D. Cal. 2006) (noting the "two circumstances which may give rise to equitable estoppel").

denying the signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of arbitration." *Hawkins*, 423 F.Supp.2d at 1050; see *Reddam*, 2004 WL 3761875 at *5 ("If the non-signatories were not allowed to compel arbitration in these instances, 'the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted,'" quoting *MS Dealer*, 177 F.3d at 947).

**a. Agency**

The non-signatory defendants argue that they are entitled to compel arbitration under agency principles because the Browns allege in the complaint that they are "agents."[41] The non-signatory defendants cite paragraph 10 of the complaint in which the Browns allege that

> "each of the defendants named in this Complaint . . . was at all times herein relevant the authorized agent, employee or representative of one or more of the remaining defendants, and that, in doing the things herein alleged, [each] was acting within the course and scope of such agency, employment or representation."[42]

The non-signatory defendants assert this language shows that the Browns "view [them] as General Steel's agents, and that in broadcasting General Steel's radio commercials, the[y] acted within the course and scope of such agency."[43]

The Browns respond that the non-signatory defendants misread paragraph 10. They assert that they did not allege that all defendants are agents of General Steel, but rather that "each of the defendants named in this Complaint" is an agent of "one or more of the remaining defendants."[44] While one possible interpretation of paragraph 10 is that all defendants are agents of General Steel, an equally plausible interpretation is that Knight is an agent of General Steel, and Network and Aurendt are agents of Holding. As noted, only General Steel was a signatory to the arbitration agreement. Because the

---

[41]Non-Signatory Defendants' Memorandum in Support of Motion to Compel Arbitration ("Non-Signatory Def.'s Mot.") at 8-9.

[42]Complaint, ¶ 10.

[43]Non-Signatory Def.'s Mot. at 8.

[44]Complaint, ¶ 10.

Browns do not specifically allege that the non-signatory defendants are, or are being sued as, agents of General Steel, the agency argument fails.[45]

**b. Equitable Estoppel**

Although the non-signatory defendants cannot compel the Browns to arbitrate under an agency theory, they can invoke equitable estoppel to compel arbitration if: (1) the complaint alleges that they and General Steel engaged in substantially interdependent and concerted misconduct; or (2) the misconduct in which they are alleged to have engaged is grounded in or intertwined with General Steel's contractual obligations to the Browns. The claims alleged against the non-signatory defendants arise out of advertising, and thus do not appear to relate directly to the contract between the Browns and General Steel. The court will thus examine whether the Brown allege that defendants are guilty of interdependent and concerted misconduct.

It is clear that the Browns' claims against the non-signatory defendants involve the same questions of fact and law as their claims against General Steel. The Browns contend that both General Steel and the non-signatory defendants have engaged in false advertising; unfair competition; and intentional and negligent misrepresentation.[46] Each of the claims is asserted against "all defendants," and nothing in the complaint differentiates between defendants. The Browns' false advertising claim, for example, asserts that (1) "[d]efendants maintain the Website" and disseminate commercials to sell General Steel products; (2) that information on the website and in the commercials is untrue and misleading; (3) that defendants knew of the falsity; (4) that the Browns have suffered injury as a consequence of the misleading information; and (6) that defendants continue to engage in untrue and misleading advertising.[47]

These undifferentiated allegations indicate that the Browns' claims against all of the defendants

---

[45]The non-signatory defendants make no argument that they are in fact agents of General Steel. They rely exclusively on the allegations in the Brown's complaint.

[46]See Complaint, ¶¶ 32-45.

[47]See *id.*, ¶¶ 33-38. The remaining causes of action asserted against the non-signatory defendants incorporate these allegations by reference; they do not plead additional, individualized facts supporting the claims. (See *id.*, ¶¶ 39, 41, 44.)

are based on alleged misconduct that is "substantially interdependent and concerted." *Chastain*, 502 F.Supp.2d at1081 (citing *Brantley*, 424 F.3d at 396). The case thus presents a classic example of a lawsuit against non-signatories that is inseparable from claims asserted against a signatory. Consequently, it is necessary to compel the Browns' to arbitrate their claims against the non-signatories to preserve the benefit of the arbitration clause for the signatory, General Steel. See *Hawkins*, 423 F.Supp.2d at1050 ("[W]here a lawsuit against non-signatories is inherently bound up with claims against a signatory, the court should compel arbitration in order to avoid denying the signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of arbitration"). Courts have consistently compelled arbitration under similar circumstances. In *Hansen v. KPMG, LLP*, No. CV 04-10525-GLT (MANx), 2005 WL 6051705 (C.D. Cal. Mar. 29, 2005), for example, plaintiff's complaint "describe[d] the non-signatory Defendants as one team involved in a single course of misconduct . . . and [sought] to hold them jointly liable for each other's conduct." *Id.* at *3. The court granted the non-signatories' request to compel arbitration, finding that "[p]laintiff's allegations [pled] interdependent and concerted misconduct." *Id.*

Similarly, in *Becker v. Davis*, 491 F.3d 1292 (11th Cir. 2007), the complaint alleged that "both signatories . . . and nonsignatories . . . to the agreements collaborated to make unsound financial decisions." *Id.* at 1304. The Eleventh Circuit held that where claims were so interdependent, it was appropriate to compel arbitration under an equitable estoppel theory. *Id.* In *Positive Software Solutions, Inc. v. New Century Mortgage Group*, 259 F.Supp.2d 531 (N.D. Tex. 2003) the complaint, like the Browns' pleading here, failed to differentiate between signatory and non-signatory defendants when asserting claims. See *id.* at 540 ("Positive Software generally alleges throughout the First Amended Complaint that the 'Defendants' pirated its software, derived source code, and created new software incorporating LoanForce"). The court held that it alleged "interdependent and concerted misconduct" and granted the non-signatory defendants' motion to compel arbitration. *Id.* at 540-41.

As in these cases, the Browns' claims against General Steel and their claims against the non-signatory defendants are interdependent, and appear to allege concerted conduct by them. This is precisely the type of situation in which courts apply equitable estoppel to require the signatory to an arbitration agreement to arbitrate with non-signatories. Consequently, the court grants the non-

signatories' motion to compel arbitration of the Browns' claims against them.

### C. The Motion to Dismiss

Knight has moved to dismiss the action against him under Rule 12(b)(2), asserting that he is not subject to personal jurisdiction in this form. The Browns allege that Knight "formulates, controls, directs, supervises, perpetuates, manages and has knowledge of and acquiesces in the practices and policies of General Steel," and that he "knew or should have known of sales practices used by salespeople working on his and General Steel's behalf."[48] Given Knight's supervisory role and the advertisements that General Steel directed towards California, the Browns assert that the court may exercise specific jurisdiction over him.[49]

#### 1. Legal Standard Governing Specific Jurisdiction

Whether a federal court can exercise personal jurisdiction over a non-resident defendant turns on two independent considerations: whether an applicable state rule or statute permits service of process on the defendant, and whether the assertion of personal jurisdiction comports with constitutional due process principles. See *Pacific Atlantic Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985).

California's long-arm statute extends jurisdiction to the limits of constitutional due process. See *Gordy v. Daily News, L.P.*, 95 F.3d 829, 831 (9th Cir. 1996); CAL. CODE CIV. PROC. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States"). Consequently, when service of process has been effected under California law, the statutory and constitutional requirements merge, and the court asks only whether the exercise of jurisdiction over defendant would comport with due process. See *Fireman's Fund Ins. Co. v. National Bank of Cooperative*, 103 F.3d 888, 893 (9th Cir. 1996); *Aanestad v. Beech Aircraft* Corp., 521 F.2d 1298, 1300 (9th Cir. 1974).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant that has sufficient "minimum contacts" with the forum that the

---

[48]Complaint, ¶ 5.

[49]The Browns do not argue that the court may exercise general jurisdiction over Knight.

"maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two recognized bases for exercising personal jurisdiction over non-resident defendants: (1) "general jurisdiction," which arises when the defendant's activities in the forum are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. See *Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984); see also *Doe v. American National Red Cross*, 112 F.3d 1048, 1050-51 (9th Cir. 1997).

As noted, the Browns contend that it is appropriate to exercise specific jurisdiction over Knight. To establish that the court may exercise specific jurisdiction over Knight, three things must be shown: (1) that Knight did some act or consummated some transaction in California by which he purposefully availed himself of the privilege of conducting activities in the state; (2) that the Browns' claims arise out of that activity; and (3) that the exercise of jurisdiction is reasonable. *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001); *Fireman's Fund*, 103 F.3d at 894; *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

**2. Whether the Court May Exercise Personal Jurisdiction over Knight**

There is no dispute that General Steel has assented to personal jurisdiction in California. The fact that a corporation is subject to jurisdiction in the forum state, however, does not necessarily confer jurisdiction over its individual officers. Instead, the court must examine the individual's contacts with the forum to determine if they are sufficient to warrant the exercise of jurisdiction over him in connection with forum-related claims. See *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 520 (9th Cir. 1989) ("Under the fiduciary shield doctrine, a person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit that forum to assert jurisdiction over the person"). Conversely, the fact that actions constituting sufficient contacts with the state were taken on behalf of the corporate employer will not shield the individual from being subjected to jurisdiction. See *Calder v. Jones*, 465 U.S. 783, 789-90 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with

the forum State must be assessed individually"); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, n. 13 (1984) ("we today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity").

The Ninth Circuit has noted with approval language in a First Circuit opinion that "cases which have found personal liability on the part of corporate officers have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful conduct . . . or the 'central figure' in the challenged corporate activity.'" *Davis*, 885 F.2d at 524 (quoting *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)); see also *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683, 697-98 (6th Cir. 2001) (". . . other courts have found that the exercise of jurisdiction over the agent depends on the extent of that agent's personal involvement in the conduct. These courts exercised personal jurisdiction over corporate officers where the officers were active participants in the tortious conduct. There is support for this approach in Sixth Circuit case law. . . . [W]here an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment").

The Browns do not argue or allege that Knight was the "guiding spirit" behind the advertising at issue. Instead, they contend as a general matter that Knight "formulates, controls, directs, supervises, perpetuates, manages and has knowledge of . . . the practices and policies of General Steel."[50] They also assert that he "knew or should have known of sales practices used by salespeople on his or General Steel's behalf."[51] At most, these allegations indicate that Knight plays a broad managerial role within the company; they in no way suggest that he was the "guiding spirit" behind General Steel's advertising. Nor do the Browns proffer any evidence beyond the allegations in their complaint that would support drawing such an inference. The mere fact that Knight is General Steel's president is not sufficient to subject him to jurisdiction in California or give rise to an inference that he is the "guiding spirit" behind

---

[50]Complaint, ¶ 5.

[51]*Id.*

the claimed tortious conduct. See *Keeton*, 465 U.S. at 781 n. 13 (". . . jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him. . ."); *Karabu Corp. v. Gitner*, 16 F.Supp.2d 319, 325 (S.D.N.Y. 1998) ("Suing the out-of-state officers of a large, multi-national corporation based only upon their title, and absent any good faith basis for believing that they personally participated in the conduct underlying plaintiff's lawsuit, will not confer jurisdiction under a theory of agency"). In sum, the Browns offer no support for their assertion that Knight directed General Steel's advertising, and the court cannot draw that inference simply because he is the company's president.

The court reached a similar conclusion in an analogous case in this district. In *Indiana Plumbing Supply, Inc. v. Standard of Lynn, Inc.*, 880 F.Supp. 743 (C.D. Cal. 1995), plaintiff argued that the court should exercise jurisdiction over an individual corporate officer based on the corporation's advertising in the state. *Id.* at 751. The officer admitted that he was responsible for the company's advertising generally, and that he had authorized the advertisements in question. *Id.* The officer did not, however, develop the advertising campaign, nor choose to use a phrase that allegedly infringed plaintiff's trademark in the advertisements. *Id.* Analyzing the officer's conduct, the court found that "[p]laintiff ha[d] not alleged sufficient personal conduct by Mr. Berk specifically directed at California that would justify hailing him into this Court." *Id.* The court also was not "satisfied that [the officer] was the sole 'guiding force' behind the advertising campaign that has resulted in this lawsuit." *Id.*

Plaintiff's proof regarding the corporate officer's involvement in company advertising were significantly more specific in *Indiana Plumbing* than anything the Browns offer here. While the officer in *Indiana Plumbing* admitted that he was personally responsible for the corporation's advertising, and had authorized the allegedly infringing ads, the Browns neither allege nor adduce evidence that Knight played such a role. Indeed, the only allegation specific to advertising made by the Browns is that Knight "knew or should have known of sales practices" used by General Steel salespeople.[52] As *Indiana Plumbing* demonstrates, merely *knowing* that advertisements are being directed into the stream of

---

[52] *Id.*

commerce is not sufficient to establish personal jurisdiction over a corporate officer.[53]

For these reasons, the court concludes that the Browns have failed to establish that the court may exercise personal jurisdiction over Knight. It therefore grants Knight's motion to dismiss.

## III. CONCLUSION

For the reasons stated, the motions of defendants General Steel Corporation, Radio License Holding VI, LLC, ABC Radio Networks, LLC, and Paul Harvey Aurandt to compel arbitration are granted, and the action is stayed pending resolution of the arbitration proceedings. The parties are directed to file joint status reports every 45 days concerning the progress of the arbitration. Knight's

---

[53]The Browns suggest an alternative theory of personal jurisdiction based on RICO's provision for nationwide service of process. RICO provides that

> "[i]n any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof" 18 U.S.C. § 1962(b).

The Ninth Circuit has held that "merely naming persons in a RICO complaint does not, in itself, make them subject to section 1965(b)'s nationwide service provisions." *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc. ("Butcher's Union")*, 788 F.2d 535, 539 (9th Cir. 1986). Rather, there are two threshold requirements that must be met before service under § 1965(b) will confer jurisdiction. First, plaintiff must allege a multi-district conspiracy. See *id.* at 539 ("The Unions also failed to allege a multidistrict conspiracy"). Second, "the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *Id.* Implicit in these requirements is an assumption that the RICO claim has been asserted against all of the putative members of the multi-district conspiracy. As noted, however, the Browns plead a RICO claim only against Knight. Without naming the other conspirators, the Browns cannot meet *Butcher's Union* requirement that the court must have personal jurisdiction over at least one of the co-conspirators.

Even if the court were to consider co-defendants named in other causes of action as Knight's purported co-conspirators under RICO, it would conclude that the Browns had failed to satisfy the *Butcher's Union* requirements. The Browns contend, without support, that no other district in the country could exercise personal jurisdiction over all defendants because Holding owns the local radio station where the Browns heard the advertisement. (See Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Pl.'s Dismiss Opp.") at 7.) Apart from this conclusory assertion, the Browns proffer no evidence that Holding, or any other co-defendant, would *not* be subject to jurisdiction in Colorado (where Knight could be sued). Absent such a showing, the Browns cannot meet the test set forth in *Butcher's Union*. Consequently, the Browns have not established that it is appropriate to exercise personal jurisdiction over Knight under § 1965(b).

motion to dismiss for lack of personal jurisdiction is granted.

DATED: May 19, 2008

Margaret M. Morrow

MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE